UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TANYA BLUMENSHINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 21-cv-1227-JES-JEH |
| | ) | |
| | ) | |
| BLOOMINGTON SCHOOL DISTRICT | ) | |
| NO. 87, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

This matter is now before the Court on the Motion for Summary Judgment (Doc. 25) of Defendant Bloomington School District No. 87 ("District"). Plaintiff Tanya Blumenshine ("Blumenshine") ("Plaintiff") has filed a Response (Doc. 28) and Defendant has filed Reply (Doc. 31). For the reasons set forth below, Defendants' Motion (Doc. 25) is GRANTED.

## FACTS

Plaintiff Blumenshine has filed a single count complaint alleging that she was subjected to a hostile work environment due to her age in violation of the Age Discrimination in Employment Act, 29 U S.C. §621 et seq. ("ADEA"). Plaintiff was born on May 7, 1967, and has been working for the District since 1989. She has spent most of this time as a kindergarten teacher. She worked at the Irving Elementary School from 1989 through 2001; the Stevenson Elementary School from 2001 through 2019; and the Sheridan Elementary School from 2019 through the present. Plaintiff has been working as an interventionist at Sheridan since the beginning of the 2021-2022 school year. She has notified the District that she intends to retire in 2024.

1

Although Plaintiff worked at Stevenson for 18 years, she alleges only one incident to support an age-related hostile work environment. This occurred during a May 21, 2019 meeting with Stevenson principal Katy Killian, f/k/a Katy Hansen (born 1977), when Plaintiff learned she would be transferred to Sheridan. Once at Sheridan, Plaintiff alleges a series of incidents between September and December 2019, many involving Jennifer McGowan, the Sheridan Principal, born in 1977.

The sole allegation regarding Stevenson is that on May 21, 2019, Plaintiff was scheduled to meet with Principal Killian to see where she would be assigned for the 2019-2020 school year. For reasons that are not explained, Plaintiff asked that a coworker and friend, Carolynne Scott, a fourth-grade teacher, be present at the meeting. (Doc. 28-1 at 93-95). Ms. Killian has testified that Plaintiff stood in the doorway of Killian's office asking where she would be working the next school year. Killian asked her several times to sit down. When Ms. Blumenshine did so, Killian read a prepared memo, indicating that she would be transferred to Sheridan. Blumenshine said "Okay" and immediately left. Killian testified that she had intended to take notes during the meeting, but that it was so brief she did not do so. It is uncontroverted that this was an involuntary transfer permissible under the Union Collective Bargaining Agreement.

Ms. Blumenshine's account of the meetings differs. Blumenshine testified that when she and Scott arrived, Killian asked if she would agree to the meeting being recorded. Blumenshine agreed, but was not aware of any ongoing recording.  Plaintiff states, without other context, that during the meeting, Killian accused her of being disrespectful. (Doc. 28-1 at 430). When Blumenshine left the meeting, Ms. Scott told her she believed the meeting was video recorded because Scott saw a "red light" illuminate on Killian's extra laptop. *Id*. at 119. On July 12, 2019,

Blumenshine called District School Superintendent Barry Reilly to complain about allegedly having been recorded.

The parties agree that at the May 19 meeting, Killian read a memo to Blumenshine regarding the transfer. The memo stated in its entirety:

> Beginning in the 2019-20 year, Tanya Blumenshine will be assigned to teach kindergarten at Sheridan Elementary School. This transfer is being made according to the BEA[1]/District87 Agreement, Article 10.6 and 10.4.
>
> This change in placement is believed to be in the best interest of the district and the students. Mrs. Blumenshine maintains the ability, qualification, and experience to be effective in this new position. This transfer will allow Mrs. Blumenshine the opportunity to extend her efficiency as a teacher and continue to develop under new leadership, benefiting the overall advancement and achievement of students within District 87.

(Doc. 28-3 at 81).

Superintendent Reilly (born 1965), testified at his deposition that the decision to transfer Blumenshine was made by himself, Assistant Superintendent of Human Resources Dr. Herschel Hannah, (born 1950), Killian, and McGowan. The primary intent of the transfer was purportedly not to move Blumenshine out, but to move another, under-performing teacher in. Reilly testified that Latrese Galloway, incorrectly referred to as Latrese Ellis[2], was a kindergarten teacher at Sheridan who needed a "fresh start." Reilly explained that Galloway was African American, and the District's goal was to have "a diverse teaching staff which reflected the student body." (Doc. 28-5 at 26). He testified that the situation with Ms. Gallaway "just was not working, as well as anybody had hoped, but we were not going to give up we wanted her to be successful, we felt that a change in scenery might help that. That was a priority for us in the district." (Doc 28-5 at

---

[1] The Bloomington Education Association Union which operated at District 87 through a collective bargaining agreement. (Doc. 25 at 4).

[2] *See* Reilly Declaration (Doc. 25-1 at 61).

20). Reilly also noted that Blumenshine had voiced concerns about "safety" and the "behavior of students at Stevenson, (Doc. 28-5 at 21), testifying "Stevenson houses our most severe and profound special education program." *Id*.  Reilly further testified, "we felt that moving Latrese to that school and moving Tanya was the best opportunity for success for both of them." (Doc. 28-5 at 24).

Plaintiff asserts there were three kindergarten classrooms at Sheridan and six children who scored as needing additional academic support and six children who exhibited "physical behavioral tendencies." This included two students who had Individual Education Plans ("IEP") outlining their physical aggression. Plaintiff claims that five of the students from each group were placed in her classroom. (Doc. 28-1 at 64). She also claims that she asked to have some of these students transferred out and this request was refused although other teachers' requests for such transfers had been granted. (Doc. 28-3 at 5).

McGowan has submitted a sworn Declaration, asserting that she had nothing to do with the classroom makeup as the kindergarten teachers got together and created the class lists. (Doc. 31-1 at ¶ 3). McGowan attests that the challenging nature of Blumenshine's class was "unknown until after the students began attending school. . ." *Id*.  This, of course, is reasonable as these were kindergarten students who had no prior history at Sheridan. McGowan attests, further, that it was not a District practice "to remove children from a classroom in response to a teacher request because of student behavior." *Id*. at ¶ 14. She admittedly removed one student from kindergarten teacher Garrett's room, but this was for "unique personal circumstances," not related to student behavior. *Id*. McGowan attested, "I do not recall transferring any students because of student behaviors." *Id*.

4

It is clear that things did not go smoothly at Sheridan. Blumenshine testified that on September 26, 2019, McGowan entered her classroom "yelled and berated" her, and falsely accused her of "pitting" McGowan against parents. (Doc. 28-1 at 155). McGowan specifically denies that she "yelled at, berated, or falsely accused Plaintiff of pitting parents against me." (Doc 31-1 at ¶ 19).

On Wednesday, October 9, 2019, Principal McGowan sent an after-hours email to Plaintiff following an incident earlier that day when Student "J" hit Student "L" whose mother complained that she did not believe the environment was safe. (Doc. 28-4 at 11). In the email, McGowan asked, "What is the behavior management strategy you are using in the classroom to create a safe environment . . . ?" (Doc 28-4 at 11). She also questioned whether Plaintiff was utilizing "stations or centers," and was concerned as to the number of times "extra recess" or "park time" was being used. McGowan indicated she would like to meet to discuss the above concerns and asked Plaintiff to identify some good times and dates. *Id*. The following morning, Plaintiff forwarded the email to Union Representatives Matthew Sharp and Ken Hamerlinck stating, "I really need whatever help you can offer." *Id*.

Plaintiff did not respond to McGowan on Thursday and testified there was no school on Friday. On Friday, October 11, 2019, McGowan sent her a meeting request, noting there had been no response to her email. Plaintiff asserts that she had no obligation to have responded as the email was sent on a Wednesday evening and there was no school on Friday. She does not discuss that she could have replied on Thursday. Plaintiff believes that McGowan's noting her lack of response was to create a paper trail to set Plaintiff up for a claim of insubordination. (Doc. 28-1 at 158).

The meeting took place on October 17, 2019, with McGowan providing a 2-page Memorandum which identified the goal of the meeting as: "understand supports that are needed within the classroom, assist w/adjustment to different school." (Doc 28-4 at 13). The Memo contained a list of 13 recommended interventions. Plaintiff testified, however, that "most of them are just super condescending, first-year teacher instructions" while she described herself as "someone who has 30 years with this grade level with exemplary evaluation and able to get high test scores even with children that start out with pretty low test scores." (Doc 28-1 at 274-75). While Plaintiff admitted the interventions were otherwise appropriate, she stated "these are things that were already implemented in my room that I was doing before having to endure these lessons from my peers." *Id.* at 275.

Plaintiff complained that she had to "endure" the October 17 meeting, as well as another one on October 24, and a third on November 14, 2019. It appears that other teachers were present at the October 24 and November 14 meetings, with Plaintiff characterizing at least one as a "remediation meeting." *Id*. at 280-81. Plaintiff has provided minutes from the November 14 meeting titled *Follow up Meeting for Blumenshine* (Doc. 28-4 at 7) recorded by Lyndsay Gloede. (Doc. 28-1 at 259).[3]  They recount McGowan stating that Plaintiff was calling the office "multiple times per day for teacher managed behaviors not necessarily office managed behaviors." Plaintiff replied that she only did so when "children are being unsafe in the classroom." McGowan countered that there was a lot of support in the classroom as "Mr. N. is in

---

[3] *See Eller v. Gary Cmty. Sch. Corp.*, No. 08-307, 2011 WL 2945837, at *2 (N.D. Ind. July 21, 2011) (considering meeting minutes plaintiff relied on in his affidavit and which had been offered into evidence at summary judgment without objection).

the class the majority of the day."[4] McGowan also asserted that not all of the problems were safety related, as the day before, she had seen a student in Blumenshine's class running around the room. McGowan claims that she took the student to the office where he "sat quietly the entire time." *Id*.

The meeting minutes reflect that McGowan asked Blumenshine whether she had a break spot in her room. Blumenshine allegedly replied, "they are beyond that." When asked whether she had a buddy teacher to whom she could send the students, Blumenshine responded that she was "too far away to send students." *Id*. at 8. The minutes reflect that other teachers LG, KH, JH, DZ, and KR also offered suggestions. McGowan recommended that Ashley Schnittker, a special education teacher, come in to observe. The meeting ended with the notation that Plaintiff and KH would work together "to come up with a plan for getting started." *Id*.

Plaintiff was questioned at her deposition as to these minutes and an "Addendum" she had drafted, pointing out pointing out inaccuracies. (Doc. 28-1 at 257-58). In the Addendum, Plaintiff denied McGowan's claim that she had adequate support in her classroom. She also denied having said, "it's beyond that." Plaintiff did not otherwise dispute any of the statement recounted above. *Id*. at 262.

In her deposition testimony, Plaintiff discussed two particular students, Student A and Student B, each of whom had IEPs. She indicated that Brian Nikkeson was "really there every day for behavioral support" and that this really helped with these two students. *Id*. at 282. She testified, at least as to Student A, that the child had struggles with other teachers when he went to them for art, music, the learning center, and physical education. When asked whether these other teachers were given additional support when Student A was in their classrooms, Plaintiff

---

[4] This is likely a reference to Brian Nikkeson, a substitute teacher who, for a while, worked in Plaintiff's classroom on a daily basis. (Doc. 28-1 at 282).

answered that she couldn't remember. *Id.* at 144-45. She testified, however, that this overall lack

of support affected these teachers as well. *Id.* at 146-47, 149. McGowan responds, attesting that

she provided support, as well as "a special education teacher, a special education student teacher,

the Director of Special Education, Associate Director of Special Education, psychologist, a social

worker, a reading specialist, and a substitute teacher who aided Plaintiff and her students." (Doc.

31-1 at ¶ 8). Plaintiff did not specifically testify to this but acknowledged that she would

sometimes have a substitute teacher assigned to her room. She claimed that this was of little help

as it "would cause more problems than not being there, because they were not properly trained

with all of the very specific and special behavioral needs of the students that were given to me."

(Doc. 28-1 at 259).

     In addition to Student A, Plaintiff testified that Student B was not getting his "legal

minutes" as outlined in the IEP. It is unclear whether Plaintiff had any responsibility for

providing these legal minutes as she testified that, while she sent emails attempting to get the

appropriate time for Student B, "I am not his special education teacher. I am his regular

classroom teacher, but I was trying to, you know, get him his legal minutes." *Id.* at 282.

McGowan denies that there was any student who "did not receive full IEP support." (Doc. 31-1

at ¶ 15).

     On December 2, 2019, McGowan told her that Mr. Nikkeson was only going to be in her

classroom during Student B's scheduled sensory breaks. *Id.* at 282. On December 4, 2019,

Plaintiff directed an email to McGowan, complaining about the change, indicating she was

concerned about the safety of both her students and herself. She stated that there were two in her

classroom who were violent and that "between September 10 and October 24, 2019, I tried on 12

different occasions to arrange behavioral intervention meetings for one of these two children

since he has no IEP." (Doc. 28-4 at 15). She testified "I did not get student intervention meetings. I did not get a full-time, CPI aid for the student. Student A did not get his full minutes until January 9." (Doc. 28-1 at 284). She also testified that Student B was finally given a full-time CPI-certified assistant 12 days after she left on medical leave. *Id.* at 284.

Plaintiff also testified that McGowan sent a December 5, 2019, email to Superintendent Reilly falsely accusing her of ordering a student to leave the room. (Doc. 28-3 at 12). McGowan attests that special education teacher Bagley and a student teacher were in Blumenshine's classroom at the time and reported the incident to her. (Doc. 31-1 at ¶ 21)[5].

Plaintiff complained that her teaching efforts were "sabotaged" as "by not allowing my two students who had legal individual educational plans their education, special education minutes provided to them by federal law under the Individuals With Disabilities Education Act." (Doc. 28-1 at 65). As noted, McGowan denies that any student did not receive their IEP minutes. Plaintiff also claimed that administration sabotaged her by coming into the classroom unannounced, interrupting her teaching, and criticizing her. *Id.* She also testified that McGowan falsely accused Blumenshine of leaving a student unattended in the hallway and failing to implement "stations and centers" as requested, just to set her up for a claim of insubordination. *Id.* at 157-159. McGowan attests that she personally witnessed Plaintiff leaving a child unattended and this was also reported to her by others. (Doc. 31-1 at ¶ 19). In addition, she denies "interrupting," stating she regularly visited all teachers and classrooms. *Id.* at 7.

---

[5] The Court will consider this statement as not offered for a hearsay purpose, whether Plaintiff ordered the student out of the room, but as to McGowan's motivation in authoring the email.

9

Dr. Reilly testified that he was aware of Plaintiff's complaints and discussed them with Dr. Hannah, and McGowan.[6] (Doc. 28-5 at 36). Dr. Reilly and others felt it might be helpful for Plaintiff to undergo de-escalation training. McGowan testified that this was offered to Plaintiff. (Doc. 28-6 at 103). Plaintiff counters that it was not "offered," as she was told she had to have it. Plaintiff testified that she had a 15-pound lifting restriction and stated that past administrators had said "that they don't want me to do the CPI training because of that." (Doc. 28-1 at 285).

Ms. McGowan acknowledged that Blumenshine's class presented more significant challenges than the other two kindergarten classrooms. (Doc. 28-6 at 98). She testified that, while Blumenshine requested a CPI-certified aide, these individuals are trained to put physical "holds" on children "when they're being completely unsafe with themselves or others." *Id*. at 101. McGowan testified that the goal was for Blumenshine to be proactive, so students did not escalate to that point. *Id*. McGowan testified that Plaintiff was provided written de-escalation techniques which McGowan referred to in their weekly professional development meetings. *Id*. at 102. In addition, she offered CPI training to Blumenshine. Blumenshine claims that although McGowan stated that she would set up the training, she did not do so, and this was done to manufacture evidence of insubordination. It does not appear, however, that Plaintiff would have availed herself of the training due to the 15-pound. lifting restriction. *Id*. at 285.

Plaintiff also complained about Dan Zummo, a "principal intern," a certified teacher in training to be a principal. McGowan testified that Zummo "could go into classrooms, he could observe, he could assist when there are behavioral issues. So he kind of mirrored what I did on a daily basis. He could run meetings. He could run data." (Doc. 28-6 at 104). On October 15, 2019, Zummo entered Plaintiff's classroom at 4:00, unlocking the door. Plaintiff claims that Zummo

---

[6] Reilly testified that Leslie Hanson, the Director of Special Education, might have been there as well but could not testify to this with certainty.

berated her during this meeting but also testified that they watched videos made by the

kindergarten class. At one point, Zummo noted that Plaintiff had come from Stevenson, "a school

where kids punched children in the face or punched teachers -- children punched teachers in the

face[.]" adding "Like what's going on with you this year?" Doc. 28-1 at 182). Plaintiff felt that

she was being threatened and "baited" and asked him to leave.

> Blumenshine sent Zummo an email the following day, October 16, 2019, stating:
>
> As a female who is also older, I am asking that you do not enter my classroom again
> before 8:15 a.m. or after 3:45 p.m. unless, of course, a child is in danger. At 4:20
> p.m., I asked you to leave and you did not. Continuing your narrative with putting
> words in my mouth that I did not say or think, standing and taking great pause left
> me shaken.

 (Doc. 28-3 at 84-85). McGowan met with Plaintiff to discuss the memo and followed up with

Zummo, asking that he speak with her before going in to talk to a teacher, he agreed. (Doc. 28-6

at 108-09).

When questioned at her deposition, Plaintiff admitted that the Zummo email did not

mention discrimination or a hostile work environment. She stated, however, that she "reached

out numerous times using examples and words that are synonyms." *Id*. at 286. She also admitted

that neither McGowan, Killian, nor Reilly had made any comments about her age. *Id*. at 287.

When asked why she believes McGowan engaged in age discrimination, she stated, "The only

difference is that I am older. Again this is a subjective question. You know like I mentioned

before, I can't get into her head. But it was very obvious that she was intentionally harassing –

discriminating against me and harassing me. I do not believe that she would have done that if I

were her age. (Doc. 28-1 at 150-51). She also replied, when asked the basis for her belief as to

age discrimination, that her work performance had not changed and the only thing that had

changed was her age. *Id*. at 62.  Plaintiff alternately testified that McGowan's alleged actions

were due to McGowan's interest in getting promoted. (Doc. 28-1 at 63). And that Killian's actions were due to Plaintiff having allegedly witnessed an incident of child neglect, not otherwise explained. *Id*. at 137.

It appears that Plaintiff was off of work after December 2019. She testified inconsistently that she had surgery in January 2020, and was out for six weeks; and that she had surgery on February 1, 2020, and was out for six weeks. *Id*. at 297, 284. Regardless, Plaintiff returned from leave in mid-March, 2020, the day school closed due to the Covid pandemic. *Id*. at 297-98. Plaintiff worked remotely the entire 2020-21 school year as in-school sessions did not resume until the Fall of 2021. *Id*. at 169. In the Fall of 2020, Danel Harr was appointed Sheridan principal after McGowan was involuntarily transferred to be the assistant principal at Bloomington Junior High School. (Doc. 28-6 at 17). In March 2021, Ms. Harr offered Plaintiff a position as an academic interventionist. When Plaintiff returned to Sheridan, it was not as a kindergarten teacher but as an interventionist. Plaintiff explained that in this position she worked "with six teachers [to] help them with any children that are struggling." (Doc. 28-1 at 167).

Blumenshine alleges that she suffered age-based discrimination created a hostile working environment through:

(1) surreptitious video and audio recording of her during a meeting that was supposed to be private;

(2) removing her from her position and moving to a different position that was less desirable;

(3) refusing to provide proper support to her in the classroom;

(4) assigning her the vast majority of students who were academically at-risk and who had behavioral issues;

(5) intentional efforts to sabotage her teaching efforts by not providing her students with individual intervention;

(6) attempting to set her up for charges of insubordination;

(7) erroneously and improperly criticizing her job performance; and

(8) physical intimidation by administrators.

(Doc. 1 at 2-3).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). It must be the type of evidence "on which a reasonable jury could rely." *Jones v. City of Elkhart, Ind.*, 737 F. 3d 1107, 1113 (7th Cir. 2013) (quoting *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

<u>Plaintiff Does Not Establish a Hostile Work Environment</u>

The ADEA provides that an employer may not "discharge any individual or otherwise discriminate against any individual" 40 years or older "with respect to his compensation, terms, conditions, or privileges of employment," based on age. 29 U.S.C. § 623(a), 631(a). *Hoosier v. Greenwood Hosp. Mgmt. LLC*, 32 F. Supp. 3d 966, 974 (N.D. Ill. 2014). Unlike a Title VII discrimination claim where the plaintiff need only show that discrimination was a motivating factor, under the ADEA, the plaintiff must prove "by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 177-78 (2009).

As Defendant notes, the Seventh Circuit has never affirmatively stated that the ADEA allows a claim for a hostile work environment. *See Tyburski v. City of Chicago*, 964 F.3d 590, 600–01 (7th Cir. 2020) ("We have "assumed, but never decided, that plaintiffs may bring hostile environment claims under the ADEA.") (citing *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005)). As in *Tyburski*, however, the Court need not consider this issue as Plaintiff has failed to establish a material issue of fact to support that she was subjected to a hostile work environment and that this was due to her age.

Here, neither party has drafted its arguments under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), nor need they. *See Almblade v.*

14

*Wormuth*, No. 20-04196S, 2021 WL 4341931, at *4 (C.D. Ill. Sept. 23, 2021) (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016) ("suggesting that when a plaintiff does not present her response to a summary judgment motion in *McDonnell Douglas* terms, the court need not analyze the case through that framework").

The Court is required, however, to determine whether Plaintiff has "produced sufficient evidence to support a jury verdict of intentional discrimination." *Id*. (citing *David v. Board of trustees of Community College Dist. No. 508*, 846 F. 3d 216, 224 (7th Cir. 2017)). In *David*, the Seventh Circuit referenced the holding in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which mandated a holistic review of the evidence in a discrimination case. "As *Ortiz* and our other case law make clear, however, *McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination. In adjudicating a summary judgment motion, the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *Id*. at 224. Whether or not the Court utilizes the *McDonnell Douglas* approach, it must assess the evidence as a "whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765; *Skiba v. Illinois Central Railroad Co.*, 884 F. 3d 708, 720 (7th Cir. 2018).

To establish an age-related hostile work environment claim, the plaintiff must prove that "(1) she was harassed, (2) the unwelcome harassment was based on her age, (3) the harassment was sufficiently 'severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere,' and (4) a basis exists to hold the employer liable." *Tyburski*, 964 F.3d 590, 601-602 (citing *Racicot*, 414 F. 3d at 678). "In evaluating the objective offensiveness of a plaintiff's work environment, we consider all of the circumstances, including frequency and severity of the conduct, whether it is humiliating or physically threatening, and

whether it unreasonably interferes with an employee's work performance." *Id.* at 601-02 (citing *Luckie v. Ameritech Corp*., 389 F.3d 708, 714 (7th Cir. 2004). Notably, however, there must be "a connection between age discrimination and the harassing conduct." *Lindeman v. Vill. of Oak Brook*, No. 00-818, 2002 WL 1822923, at *14 (N.D. Ill. Aug. 8, 2002).

<u>Stevenson Elementary School</u>

The Court finds that Plaintiff's hostile work environment claim fails to the extent it is based on the allegedly surreptitious video recording. Blumenshine does not claim to have been aware of any recording, only to have been told this by Ms. Scott. Ms. Scott's statement cannot be considered here, as it is mere hearsay unsupported by a sworn declaration or testimony by Scott. *See Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1237 (S.D. Ind. 2014), *aff'd sub nom. Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068 (7th Cir. 2016). There, the court refused to consider the statement of a non-testifying third party at summary judgment "as the statements of a non-testifying third party offered for their veracity, they are hearsay not subject to any exception recognized by the Federal Rules of Evidence." (citing Fed. R. Evid. 801, 802; *Tomanovich v. City of Indianapolis*, No. 02-1446, 2005 WL 4692616, at *1 (S.D. Ind. 2005)). Killian denies recording the meeting and Plaintiff does not claim to have any personal knowledge that it was recorded. In addition, while Blumenshine takes issue with allegedly having been recorded by Killian, she admittedly consented to it.

Plaintiff additionally claims that she was subjected to an age-related hostile work environment when she was involuntarily transferred from Stevenson to Sheridan, a "far less desirable" position. (Doc. 1 at 2). Plaintiff asserts that this was an adverse employment action prohibited under the ADEA. It is uncontested, however, that the collective bargaining agreement provided for involuntary transfers. The transfer did not appear to result in a significant change in

commuting time as Sheridan is only four miles from Stevenson. (Doc. 28-1 at 122). In addition,

Plaintiff remained in the same role as a kindergarten teacher and did not suffer any change in

salary or benefits. *See* (Doc. 25 at 22) (citing *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270,

274 (7th Cir. 1996) ("Obviously a purely lateral transfer, that is, a transfer that does not involve a

demotion in form or substance, cannot rise to the level of a materially adverse employment

action. A transfer involving no reduction in pay and no more than a minor change in working

conditions will not do, either.").

As Defendant notes, a lateral transfer in the school context is not a sufficiently adverse

employment action to rise to the level of discrimination. *Id.* (citing *Dass v. Chicago Bd. Of

Educ.*, 675 F.3d 1060, 1070 (7th Cir. 2012) (finding teacher's transfer to teach a different grade

did not amount to an adverse action where, despite the teacher's belief that seventh grade was

harder to teach, it did not sufficiently alter the teacher's work environment). *See also Bennington

v. Caterpillar Inc.*, 275 F.3d 654, 660 (7th Cir. 2001) (finding in an ADEA hostile work

environment claim that defendant's behavior, even if rude or unfair, did not "rise to the level of

legally redressable discrimination.").

<u>Sheridan Elementary School</u>

Plaintiff described her kindergarten classroom at Sheridan as "just so sad and hard."

(Doc. 28-1 at 142). It is clear that Plaintiff made a series of complaints to Sheridan Principal

McGowan indicating she wanted more help. Plaintiff asserts that she was unfairly criticized and

not given the help she requested due to her age. She further asserts that this affected her job

performance as her efforts were sabotaged and she was "set up" to be charged with

insubordination, although this never occurred. Plaintiff maintains she was an exemplary

employee, providing her 2016 and 2018 performance evaluations where she had been judged "Distinguished."

Despite these claims, however, Plaintiff did have some performance issues. Before the transfer, Principal Killian and Superintendent Reilly had discussed Plaintiff's complaints about the behavior of students at Stevenson. They have provided credible testimony that while the transfer was primarily intended to give Latrese Galloway a fresh start, it was also hoped that it would prove beneficial to Plaintiff. As noted, Plaintiff began experiencing difficulty at Sheridan early on. McGowan complained to her about her interactions with parents and most particularly, about the behavior of her students. Despite her claims to the contrary, Plaintiff was provided help in the classroom and, apparently, regular coaching meetings with McGowan. Plaintiff was offended by these interventions, considering them insulting and demeaning. While Plaintiff testified that McGowan screamed at her or criticized her in front of students, she did not expound to give context to the claim, or testify that it happened on more than one occasion. McGowan, of course, has denied this.

It appears uncontroverted that Plaintiff had a disproportionate number of difficult students. According to McGowan's declaration, this might have been unlucky and unforeseen, as Blumenshine and the other two kindergarten teachers had drawn up the class assignments. While it might have been prudent for the District to allow Blumenshine to transfer some of her students, it was not a practice of the District, or at least McGowan, to transfer for student behavior issues. The District claims it relied on Plaintiff's years of experience and prior job performance and that it provided her the support she needed to succeed. Plaintiff asserts that this is mere pretext,[7] that

---

[7] Defendant asserts that Plaintiff's pretext analysis is not proper as she does not cite authority to support that the pretext analysis used in discrimination cases under the McDonnell Douglas approach applies in harassment cases. (Doc. 31-1 at 24). Similarly, Defendant does not cite authority to support that it does not apply.

the District wanted her to fail. She does not particularly offer a reason as to why the District

would want this, other than vaguely claiming it was due to her age. *See* Plaintiff's deposition

testimony when asked the question:

> Q. What was the basis of why she would want to harass you for that [age-related]
> reason?
>
>  A. Again, the only facts that I have -- I've never seen anything like this or
> experienced anything like that this. The only facts I have is the only difference is
> that I'm older.

(Doc. 28-1 at 150).

Here, it appears that Plaintiff's employment was especially challenging because of the

student population rather than discrimination by the District. Although both Stevenson and

Sheridan were Title I low-income schools, and Stevenson was viewed as the more difficult

school, it might be that Sheridan had a more challenging kindergarten population than

Stevenson, at least in this particular year. The Court finds no support for Plaintiff's claim that the

District was trying to force her to resign (Doc. 28 at 30), as the District later transferred her to a

different position, away from the struggles she encountered in the classroom.

Rather than hoping Plaintiff would fail, the District provided support. McGowan

conducted one-on-one professional development meetings and group meetings in an effort to

help. Plaintiff was resistant to these attempts, viewing them as insulting, demeaning, and part and

parcel of the hostile work environment. It appears that nothing would satisfy Plaintiff other than

providing a CPI-certified aide dedicated to her classroom. While Plaintiff believed this was

necessary and should have been done promptly, school districts do not have limitless budgets or

personnel. While Plaintiff takes issue that Student A did not get his full minutes until January 9,

2020, and Student B was not provided a full-time CPI-certified assistant until 12 days after she

left for medical leave, she does not provide evidence that any delay was due to discriminatory animus rather than budgeting or hiring concerns.

The Court finds ill-supported Plaintiff's claims that Zummo intimidated her to the point of creating a hostile work environment. Zummo came to Plaintiff's classroom after-hours on one occasion, to talk to her about performance issues. Plaintiff testified that during this encounter, she and Zummo watched videos that her students had done, although she claims this was only to de-escalate the situation. (Doc. 28-1 at 178). The fact that Zummo came at 4:00 after class had been dismissed does not seem irregular when he wanted to discuss performance issues. In addition, his sitting between Plaintiff and the door does not, on its own, suggest that he was trying to frighten or intimidate her. Plaintiff states that she asked him to leave, and he stayed another 5 minutes. She offers little detail, however, of this request. Did she ask him to leave telling him she was busy, in which case he might not have felt compelled to hastily exit? Did she tell him she was frightened, and he needed to leave immediately? As noted, the onus is on Plaintiff to establish facts to support that this was intimidation in the context of a hostile work environment, and she has failed to do so.

While Plaintiff subjectively felt that the work environment was hostile, the Court does not find it was objectively so. *See Tyburski*, 964 F.3d at 601 (quoting Racicot, 414 F. 3d at 677) ("'A hostile work environment is one that is both objectively and subjectively offensive.'") (in turn citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998); *Kawczynski v. F.E. Moran, Inc.*, 238 F. Supp. 3d 1076, 1087 (N.D. Ill. 2017). While Plaintiff believes the objected-to conditions were evidence of age discrimination, she does not claim that others had more help than she did. She alleges that the other teachers, too, did not have adequate support when her students were in their classrooms. (Doc. 28-1 at 143, 149). She also fails to establish that any

20

dissatisfaction with her performance created a discriminatorily hostile work environment. *See Darbha v. Capgemini Am. Inc.*, 492 Fed. Appx. 644, 647 (7th Cir. 2012) (receiving unfavorable performance review and being subjected to a performance improvement plan not enough to establish an abusive working environment); *Eib v. Marion Gen. Hosp., Inc.*, No. 17-277, 2019 WL 1545175, at *12 (N.D. Ind. Apr. 8, 2019) (finding that plaintiff's evidence of "nebulous hostility" from a supervisor and having been suspended twice was insufficient to establish a hostile work environment and avoid summary judgement) (*reconsidered on other grounds in* 2019 WL 3774234 (N.D. Ind. Aug. 12, 2019).

<u>Plaintiff Does Not Establish That the Allegedly Hostile Conditions Were Age- Related</u>

Plaintiff has failed to support that a material issue of fact remains to support that she was subjected to a hostile work environment. Even if it were otherwise, there is no evidence that the conditions she encountered were due to her age. The Court recognizes that there is some disputed testimony, particularly between Plaintiff and McGowan. At the end of the day, however, Plaintiff admits that none of the District employees made reference to her age (Doc. 28 at 30). Even if a jury were to find a hostile work environment, it could not reasonably find that this was due to Plaintiff's age. *See Trahanas v. Nw. Univ.*, 64 F.4th 842, 852 (7th Cir. 2023) (quoting *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) ("A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'").

Plaintiff admits that this case "is somewhat unique because there were no specific references by the District to Blumenshine's age." (Doc. 28 at 30). Notwithstanding, Plaintiff asserts that a grant of summary judgment would not be proper as, "a factfinder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness

into question precludes summary judgment." *Id*. at 31 (citing *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002)); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995). Plaintiff baldly asserts that the District's reasons for questioning Plaintiff's classroom management were false. It is uncontroverted, however, that there was at least one incident of a child hitting another, at least one parent complaint, and Plaintiff called the office about student behavior multiple times a day.

Here, Plaintiff started asking for help in September 2019, and it did not materialize until January 2020.[8] Regardless, the assistance was provided, and Plaintiff has not provided credible evidence that but-for age discrimination, it would have been provided sooner. Similarly, Plaintiff has failed to provide credible evidence that but-for age discrimination, the District would not have addressed Plaintiff's student behavior management and would not have offered the one-on-one and peer coaching interventions that she found so objectionable. *See Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740–41 (7th Cir. 2010) (recalling that it is the plaintiff's burden to show that defendant was motivated by age discrimination, rather than defendant's "burden to show that it was not." (citing *Gross*, 557 U.S. at 177-78.

## CONCLUSION

For the reasons stated above, the motion for summary judgment of Defendant Bloomington School District No. 87 (Doc 25) is GRANTED. The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff. All pending deadlines are VACATED. This case is now TERMINATED.

---

[8] Strangely, Defendant does not address whether there were budgetary or personnel issues that delayed this assistance.

ENTERED this 6th day of November, 2023.

<u>s/ James E. Shadid</u>
JAMES E. SHADID
UNITED STATES DISTRICT JUDGE